(No. 14309.—Decree affirmed.)

JOHN HERCZEG, Appellee, *vs.* ARMIN WEISS, Appellant.

*Opinion filed October 21, 1922.*

1. SPECIFIC PERFORMANCE—*when allegations are sufficient to authorize testimony as to fiduciary relationship.* In a suit for the reformation and performance of a contract for a conveyance, allegations that the complainant, who was of foreign birth, could neither read nor understand English and could read but poorly the foreign language in which the contract was written, that the defendant knew of the complainant's ignorance, and that the complainant relied upon the defendant, who was a justice of the peace, was of the same nationality as the complainant and familiar with real estate contracts, constitute sufficient averments upon which to base testimony relating to a fiduciary relationship.

2. SAME—*when a fiduciary relation exists.* Fiduciary relations are not confined to the legal relation of attorney and client, guardian and ward or parent and child, but such relation exists whenever it is proved that confidence is reposed by one and the trust is accepted by another, or where confidence is reposed on one side and there is resulting superiority and influence on the other.

3. SAME—*burden is on fiduciary to prove contract was entered into in good faith.* Where a fiduciary relation exists, the burden is on the one in whom such confidence has been reposed to show that any contract entered into by the parties to such relationship is not against equity and good conscience.

4. SAME—*when contract will be reformed and enforced.* In a suit for the reformation and specific performance of a contract for a conveyance, where the evidence establishes a fiduciary relationship and the defendant has failed to show that no unfair advantage was taken by him, but, on the contrary, the evidence tends to show that the defendant, in reading the contract to the illiterate complainant, omitted the provisions as to which the complainant seeks a reformation, the contract will be reformed and specifically enforced, provided the complainant has paid the purchase price.

APPEAL from the Circuit Court of Madison county; the Hon. J. F. GILLHAM, Judge, presiding.

J. B. HARRIS, for appellant.

M. R. SULLIVAN, for appellee.

Mr. JUSTICE STONE delivered the opinion of the court:

This is a bill to reform a written contract for the sale of real estate so as to conform to the verbal contract relating thereto, and for specific performance of the contract as reformed. The bill charged that appellant was the owner of the real estate involved. A few days prior to the 19th of April, 1919, appellant and appellee entered into an agreement by which appellant sold the property to appellee for $1600, the vendor to build a fence around the property. The purchase price was to be paid in installments, the final installment to be paid by February 23, 1920. It appears from the bill that both the appellant and appellee are Hungarians; that appellee is unable to read or write the English language and reads and writes the Hungarian language but poorly; that appellant understands the English language as well as the Hungarian; that he was in the real estate business, was a justice of the peace, and assured appellee that he would treat him fairly. The bill charges that appellee relied entirely upon appellant in this transaction and did not attempt to read the contract or have it read to him by anyone other than appellant; that appellant fraudulently and purposely avoided reading certain parts thereof; that appellee asked to have a copy of the contract given him on the day it was executed, but that appellant for one reason or another failed or refused so to do until the 2d day of June, 1920, when he was compelled by an order of the circuit court of Madison county to turn over a copy of the contract to appellee. The contract was written in the Hungarian language and as translated is set out in the bill. It is, in substance, an agreement for the sale of the property in question in Try-City Park, Madison county, for $1600. As translated, the portion appellee alleges was not read to him reads as follows: "with three rooms, without interest, but yet the together constructed and after the payment of repair expenses named, buyer must buy fourth room which is built to it and every construction, beside 1600 dollars."

Following the above quoted language, the contract sets out
that the vendee is to pay $400 cash, and in case he sells
certain Missouri land will pay the amount derived there-
from on the house and lot purchased, balance to be paid
in installments.  Appellee alleges in his bill that when ap-
pellant read the contract to him he did not read the part
therein just quoted.  Without that provision the contract
was practically as agreed to between them, except as to
appellant's agreement to build a fence around the premises.
Appellee filed an amendment to his bill, setting out that
appellant, on the date at which the contract of sale was
executed, did by fraudulent representation to appellee as to
the character of the instrument secure the signature of ap-
pellee and his wife to a judgment note in the sum of $1154;
that the note was wholly without consideration, fraudulent
and void, and that in signing the same the appellee relied
upon appellant's statement that he was signing a paper in
connection with his purchase of the property; that he so
believed until May 15, 1920, when he was served with an
execution by the sheriff; that he then learned that this paper
was a judgment note, and that the execution served on him
was an execution on the judgment entered on that note over
and above certain credits, showing a balance of $743, with
$100 attorney fees.  The appellant filed his answer denying
all the material charges of the bill.  The cause was re-
ferred to the master to take proof.  The master found that
the original parol agreement was that appellee was to have
the house and lot for the sum of $1600, but that after mak-
ing the contract, and after appellee had gone into possession
of the premises, appellant, under an arrangement with appel-
lee, made certain repairs about the premises which were rea-
sonably worth $100, and that said sum should be paid by
appellee to appellant.  The master also found the contract
should be reformed as prayed in the bill and as reformed
enforced by a decree for specific performance.  The chan-
cellor overruled the exceptions and approved the master's

304—35

report. Appellee excepted to the finding of the master that he should pay to the appellant the sum of $100 for the repairs made after he took possession, and has assigned the same as cross-error here.

Evidence was introduced on the hearing before the master tending to show a fiduciary relationship existing between appellant and appellee. This testimony was objected to by the appellant on the ground that the bill did not charge a fiduciary relationship. The bill charged, in substance, that appellee is unable to read or understand the English language; that he understands or writes the Hungarian language poorly; that he had been acquainted with appellant for some time; that appellant was a justice of the peace; that he knew the appellee was ignorant and uneducated and hardly able to read or understand the Hungarian language; that appellee told appellant that he was not familiar with conveyances of real estate or deeds or contracts; that he would have to rely solely on appellant, and that appellant stated to him that he (appellant) being a justice of the peace knew how to draw contracts and that he would treat him fairly and honestly; that he told appellee that the contract would enable him to purchase the property for the sum of $1600, to be paid in installments, and that appellant would erect a fence around the premises. The bill charges that appellee relied on those statements and protestations of honesty and fair dealing in signing the contract, and that appellant knew that he was relying upon his honesty and believing that he would set forth the contract in correct terms. We are of the opinion that these allegations constitute sufficient averments upon which to base testimony relating to a fiduciary relationship.

Fiduciary relations are not confined to the legal relation of attorney and client, guardian and ward, or parent and child, but such relation exists whenever it is proven that confidence is reposed by one and the trust is accepted by another. A fiduciary relationship exists where confidence

is reposed on one side and resulting superiority and influence on the other. Fiduciary relations need not be legal,— they may be moral. If such relations exist, the burden is on the one in whom such confidence has been reposed to show that any contract entered into by the parties to such a relationship is not against equity and good conscience. (*Campbell* v. *Freeman,* 296 Ill. 536; *Bordner* v. *Kelso,* 293 id. 175; *Mayrand* v. *Mayrand,* 194 id. 45; 2 Pomeroy's Eq. Jur.—3d ed.—sec. 956.) The evidence on this point tends to show that for some time prior to the making of this deed appellant and appellee were on friendly terms; that appellee frequently visited the office of appellant; that a short time before the making of the contract, April 19, 1919, appellee came to the office of appellant and told him that there was some difficulty between himself and his wife with reference to the handling of the family funds; that appellant went with appellee to the office of A. R. Johnson, an attorney at law in Granite City; that appellant acted as interpreter for him; that while at Johnson's office the latter drew up what purported to be a bill for accounting on behalf of appellee against his wife, averring that differences had arisen between them which led to a separation and living apart; that this bill was filed and the summons was issued and served on appellee's wife, and she, not knowing or understanding what it was, immediately went to appellant's office; that as soon as she arrived there appellant took her to Johnson's law office, appellant acting as interpreter for Mrs. Herczeg also. It appears that by this transaction the sum of $300 was turned over by appellee to Johnson and $600 was given Johnson by appellee's wife; that certain farm lands which appellee owned in Missouri were deeded to Johnson during the transaction, whereupon the suit was dismissed; that on April 12, 1919, appellant took appellee to St. Louis and there had him deposit $400 of his money in the name of appellant as trustee; that a few days thereafter appellant went to St. Louis with ap-

pellee's wife and had her deposit $1000 in a bank in his name as trustee. Johnson claims to have bought the Missouri land of appellee but after this suit was started deeded the same back to the appellee on receiving the amount of taxes paid out. He claims the $300 paid him was for services in drawing up the bill against appellee's wife. It appears, however, that appellee and his wife were not living apart, and it would seem that friendly advice would have been sufficient to settle their differences. It appears that Johnson got the $300 and the farm through the influence and advice of the appellant, who posed as appellee's friend. We are of the opinion that a fiduciary relationship is established by the proof.

Coming then to the question whether or not the contract entered into was in accordance with the parol agreement or was executed fraudulently, we find the positive testimony of appellee that he was to purchase the house for the sum of $1600 on partial payments and appellant was to build a fence around the property. This is denied with equal positiveness by appellant. Appellee's testimony concerning the purchase price, however, is corroborated by the testimony of certain of appellee's witnesses concerning what took place on April 19, when the written contract was executed. Mike Rapats testified that he was present when the contract was executed; that appellant read the contract, saying that the purchase price was to be $1600; that as he remembered the agreement appellant was to do some repair work but he did not read who was to pay for it. Theresa Rapats testified that appellant said to her: "Isn't that nice; for $1600 I sell property and I put up fence, too." This witness admitted that she had some feeling against appellant by reason of former transactions. George Nemeth, who was offered as a witness for the defense, stated that appellant read the contract and afterwards asked him if he wanted to read it, and he said he did not; that he asked Rapats if he wanted to read it, and he said he did not; that

he offered it to appellee, but that appellee did not have his glasses and could not see good and said that it was all right. He stated that appellant did not read the part of the contract referring to the payment of the cost of the fourth room. John Varga, who did janitor work for appellant, testified for appellant that he saw him give appellee a yellow paper not long after the contract of April 19 was executed; that he heard appellant and appellee talking about the price of the house, and appellant said the price would be $1600 but appellee would have to pay added expense of building. Rose Weiss, daughter of appellant, corroborates Varga concerning the making of the contract, testifying that it was all read over aloud by appellant and by the witness Rapats. Appellant also offered the testimony of John Fechte, the notary public before whom the contract was acknowledged, who stated that he asked appellee if he understood the contract and he replied that he did.

Under the rule as stated, a fiduciary relation having been established, the burden rested upon appellant to show that the contract entered into between him and appellee was free from any unfair advantage or over-reaching on his part. An examination of the testimony in the record convinces us that he has not sustained that burden. The witnesses for appellee, aside from Mrs. Rapats, who admits that she has a feeling against the appellant, appear not to have any interest in the outcome of this suit. Appellee's testimony seems further corroborated by the proof in the record that the house referred to in the contract as one of three rooms, with a fourth to be added, was in fact a four-room house; that the fourth room had been added in 1916, approximately three years prior to the making of the contract. There would appear, therefore, to be no reason for making a provision in the contract providing for payment for the fourth room. It seems at least unusual that such cost, if to be included at all, was not added to the contract price. The bill charges, and the proof shows, that appellee had

paid the entire sum of $1600 claimed by him to have been the purchase price. We are of the opinion that the chancellor did not err in decreeing that the contract be reformed and performed when reformed.

Concerning the note for $1154 upon which judgment was taken against appellee and his wife, the testimony of appellee and at least two witnesses shows that at the time of the acknowledgment of the contract of April 19, 1919, before the notary public, appellant had in his hand a small paper which he directed appellee and his wife to sign, saying that it was a paper necessary to be made out in the buying of the property. Appellee testified that he had no knowledge it was a note; that there was no consideration for the note and no understanding that he was to give a note. Rapats stated that when he asked appellant if they were also to sign the note as witnesses he replied that they were not; that appellee and his wife, only, would sign it. The note appears to have been witnessed by Rose Weiss, the daughter of appellant, who corroborates her father concerning its execution. Appellee's witnesses, however, testify Rose Weiss was not present at the time the small paper was signed, and their testimony seems to be corroborated by an examination of the note, which discloses her signature to be in a different color and kind of ink. Appellant's explanation of the issuance of the note is that the property was sold for the sum of $1600 plus the cost of repairs and improvements, including the fourth room to the house; that the total purchase price, upon computation, amounted to $2200; that the note, which was dated something less than a month after the contract for sale of the property, was given to represent a balance appellee owed on the property. The master found that this note was wholly without consideration and void, and the chancellor sustained such finding. We are of the opinion that the decree in that regard is supported by the evidence. The price at which

this property was sold was $1600, to be paid in partial payments. The evidence shows that payments amounting to $900 were made at the time of the making of the contract. There appears no reasonable basis in the evidence upon which consideration for this note can be founded. We are of the opinion that the chancellor did not err in decreeing the note to be canceled and delivered up as null and void. On motion of appellee's counsel the circuit court set aside the judgment on this note and appellant then dismissed the suit thereon. It is evident that appellant sought to take advantage of the want of education and the confidence of appellee in him.

Concerning the requirement for the payment of the sum of $100, the master found, and the chancellor decreed, that the arrangement by which certain repairs .were made by appellant arose after the making of the contract. Appellee contends that it was a part of the contract that appellant was to build a fence. The evidence shows that in addition to building the fence appellant paid for the repair of a chimney and built a porch on the house after appellee went into possession thereof. Appellee received the benefit of these repairs, and even conceding that the evidence showed that he was entitled to have this fence built without cost to him under the contract, there was no agreement on April 19, or prior thereto, to make the other repairs referred to, and from the record we are unable to say that the chancellor erred in finding that such repairs were reasonably worth the sum of $100.

We see no reversible error in the decree, and it is therefore affirmed.　　　　　　　　　　　*Decree affirmed.*